# Staunton.

## SCHOOL BOARD OF SAND LICK DISTRICT v. W. H. SMITH AND OTHERS.

### September 21, 1922.

1. DEEDS—*Estoppel—Grantor Estopped as Against Grantee to Assert Anything in Derogation of the Deed.*—A party who assumes to convey an estate by deed is estopped as against the grantee to assert anything in derogation of the deed. He will not be heard, for the purpose of defeating the title of his grantee, to say that at the time of the conveyance no title passed by the deed, nor can he deny the deed its full operation and effect as a conveyance.

2. SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Lands—Compliance with Statutes as to Sale and Conveyance of School Lands.*—In a suit by a school board for the purpose of vacating a deed for lands exchanged by the board for other lands, the bill alleged failure of the grantee to comply with material requirements of the statute as to conveyance and exchange of school lands. It was admitted that the provisions of section 1466a of the Code of 1904, which applies to the sale or exchange of school property, were complied with as well as the provisions of section 1488 of the Code of 1904, but it was contended that it was necessary also to comply with the provisions of section 824 of the Code of 1904.

   *Held:* That this contention was without merit.

3. SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Lands—Section 1466a of the Code of 1904.*—A proceeding under section 1466a of the Code of 1904, for the exchange of school lands, is an *ex parte* proceeding. The statute vests the court with plenary powers, and it is not to be presumed that the judge will deem any order authorizing the exchange of the property "proper" until he has become satisfied that the title to the property which the school board will get in exchange is clear. The statute leaves the entire matter to the judge, and in case of an exchange of property no separate proceeding under section 824 of the Code of 1904 or section 1488 is necessary, in order to give validity to the deeds which are executed to consummate the exchange.

4. SCHOOLS AND SCHOOL DISTRICTS—*Exchange and Sale of Lands—Sections 824 and 1488, Code of 1904.*—Sections 824 and 1488 of the Code of 1904, in regard to the exchange or sale of school property, have no reference to property which the board is endeavoring to pass the title to,

but simply to property the title to which it desires to secure. And in the latter case, while they have the same object to accomplish, they prescribe two inconsistent methods of attaining it.

5. SCHOOLS AND SCHOOL DISTRICTS—*Exchange and Sale of Lands—Sections 824 and 1488, Code of 1904.*—There is no provision in either section 824 of the Code of 1904 or section 1488 of the Code of 1904, in regard to the sale or exchange of school lands, requiring the title to be passed upon by both the court and an attorney. The decision of either is final, if no appeal be taken. If the attorney refuses to approve the title, the deed would be void under section 824, even though the court approved it under 1488. If the attorney approved it and the court disapproved it, under the language of the statutes, it cannot be said which one should prevail. In such an event, the two statutes are irreconcilably in conflict.

6. SCHOOLS AND SCHOOL DISTRICTS—*Exchange and Sale of Lands—Statutory Provisions.*—By the act approved December 10, 1903 (Laws 1903, ch. 418), section 824 of the Code of 1904 was so amended as to require the evidence of title to be submitted to the circuit court or judge thereof for approval. And by the act approved December 28, 1903 (Laws 1903, ch. 509), section 1488 of the Code of 1904 was also amended so as to include exactly the same provision. In Pollard's Code 1904, vol. 1, both statutes contain these same provisions, which remained in force until section 824 was so amended by the act approved February 20, 1912 (Laws 1912, ch. 46), as to require the title to be examined and approved in writing by a competent and discreet attorney at law, and such approval to be recorded along with the deed. By the act approved March 21, 1914 (Laws 1914, ch. 166), section 1488 was amended and re-enacted with the same clause, contained in the act of December 28, 1903, requiring the title to be approved by the circuit court or the judge thereof. This being the latest enactment, it. repeals by necessary implication so much of section 824 as required the title to be examined by an attorney.

7. SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Property—Cancellation of Deed—Fraud.*—In a suit by a school board for the purpose of setting aside and vacating a deed by the school trustees of land exchanged for other land, the evidence was examined and held not to show that the grantee was guilty of such fraud or improper influence in obtaining the exchange deed as to warrant the court in vacating it; and this more especially as the lower court, which was alleged to have been imposed upon by the fraudulent acts of the grantee and one of the school trustees, after argument and a full consideration of all the facts shown in evidence, decided that it had not been imposed upon and that no fraud had been proven, and dismissed the bill.

8. EXCHANGE OF PROPERTY—*Vendor and Purchaser—Rescission, Cancellation and Reformation—Duty of Grantee in Deed to Disclose Information.*— Where the grantee in a deed occupied no confidential relation with

the grantor, he was under no obligations to disclose to the grantor information which he had obtained from any source as to the value of the property conveyed.   Silence on the part of the purchaser, or one of the parties to an exchange of land, or failure to disclose knowledge on his part of the peculiar value of the property sold or exchanged, would not be sufficient to warrant the setting aside of a sale or exchange fairly made without misrepresentation or fraud.

9.  SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Property—Suit to set Aside Exchange Deed on Account of Collusion with School Trustee—Evidence not Sufficient to Sustain Charge.*—In the instant case, a suit to set aside the deed of school lands in exchange for other lands, it was charged that one of the school trustees colluded with the grantee and others in procuring the exchange.   The grantee, trustee and others involved in the charge of collusion denied the charge and their testimony was not successfully contradicted.

*Held:*   That the charge was not sustained by the proof.

10.  SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Land—Badges of Fraud.*— Knowing that a school board was considering the advisability of securing a new location for a school building and being the owner of a tract suitably located for the new building, it was but natural that the other party to an exchange should offer to exchange a larger lot for the old schoolhouse lot, rather than offer to buy it, and to do so was not a badge of fraud.   It is to be presumed that the school board would not have sold the old lot without knowing where a larger one could be secured.

11.  SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Land—Fraud on Part of Trustee.*—That a school trustee was active in procuring an exchange of school lands for other lands is no evidence of fraud on his part, there being no evidence in the record to satisfy an impartial mind that he was actuated by an improper motive.

12.  EXCHANGE OF LANDS—*Enhancment in Value.*—The mere fact that a lot of land exchanged by a school board for other lands has greatly enhanced in value since the exchange is no reason for stamping the transaction as fraudulent.

13.  SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Lands—Approval of Division Superintendent.*—Where a school board exchanged school lands for other lands, it was not legally necessary to consult the division superintendent of schools before making the exchange.   The legislature has prescribed the necessary procedure to exchange school property and there is no provision requiring that the exchange shall be approved by the division superintendent.

14.  SCHOOLS AND SCHOOL DISTRICTS—*Exchange of Lands—Investigation of Value of School Lot Exchanged.*—Where a school board exchanged school lands for other lands, while it may have been negligence on the part of the trustees not to make some investigation of the value of the school lot exchanged, yet as they were doubtless fairly well in-

formed on the subject, their failure so to do did not constitute a badge of fraud.

15. RESCISSION CANCELLATION AND REFORMATION—*Hard Bargains.*—It is not the duty of a court of equity to relieve from hard bargains simply because they are such.

Appeal from a decree of the Circuit Court of Dickenson county. Decree for defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Chase & McCoy*, for the plaintiff in error.

*Irvine & Stuart, A. A. Skeen* and *S. H. & Geo. C. Sutherland*, for the defendants in error.

WEST, J., delivered the opinion of the court.

The school board of Sand Lick magisterial district, Dickenson county, owned an old school house lot containing something more than one-half of an acre of land, situated near the mouth of Mill creek, where it empties into McClure creek, and where the mining town of Moss is now located. This lot is made up of a narrow strip of level land, lying along Mill creek, and a steep hill-side, and was originally conveyed to the school board of Ervinton district as containing an half acre. Later the district lines were so changed as to transfer this lot into Sand Lick district. A one room log school house was built upon it and used for school purposes for some years. Willis district, which also adjoins Sand Lick district, erected two modern schoolhouses at points not very far from the schoolhouse in controversy, and these new schools drew away from the Mill creek school a portion of its patronage. The old log house

having become more or less dilapidated and being out of date, the question of the erection of a larger and better building was being considered by the Sand Lick district school board, and it was suggested, as the old lot was too small and near the district line, and the building inadequate, that it would be wise to secure a larger lot further up Mill creek, upon which to erect the new building.

Sometime in January, 1917, W. H. Smith secured from S. J. Viers an option to purchase a tract of and containing forty-five acres, located about one and one-half miles up Mill creek from the old location. Soon thereafter he learned that the trustees of Sand Lick district had about decided to move the schoolhouse site further up Mill creek and he approached T. K. Colley, one of the trustees, who confirmed what Smith had heard about the desired change of location, to bring the school more nearly in the center of the school population. Negotiations were entered into and Colley called a meeting of the school board at which the exchange of the old Mill creek school lot to W. H. Smith for two acres of the S. J. Viers tract was agreed upon. Forthwith the school board of Sand Lick district filed before the judge of the circuit court a petition under section 1466-a of Pollard's Code, as amended (Laws 1910, c. 243), and secured authority to make the exchange of these lots. Pursuant to the authority thus granted, the trustees, by deed dated February 14, 1917, conveyed the old school lot to W. H. Smith, and Smith and wife, by deed of even date, conveyed two acres of the S. J. Viers tract to the school board.

On February 18, 1918, W. H. Smith sold and conveyed an undivided one-sixth interest in the said one-half acre lot to Eivens Tiller. On March 12, 1918, W. H. Smith conveyed a five-sixth interest in this lot,

along with other property, to S. H. Sutherland, trustee, to secure Gallie Friend and W. B. Trivett, as endorsers on two notes of $5,000.00 each, due the Dickenson County Bank, Incorporated.

The trustees for said district were, when said exchange was made, T. K. Colley, Fletcher Powers and A. J. Viers, and when this suit was filed, Noah C. Deal, Fletcher Powers and Joseph H. Rasnick.

This suit was instituted in January, 1919, by the school board of Sand Lick magisterial district against W. H. Smith, S. J. Colley, Jr., Eivens Tiller, S. H. Sutherland, trustee, Gallie Friend and W. B. Trivett, for the purpose of setting aside and vacating the said deed from the school trustees of said district to W. H. Smith, dated February 14, 1917, conveying said schoolhouse lot near the mouth of Mill creek, on the grounds: (1) That said Smith neglected and failed to comply with some of the material requirements and provisions of the statute in obtaining said deed, and (2) because of fraud and improper influence, used by him and his confederates, in obtaining this exchange deed.  The bill also prays for the cancellation of the deeds, aforesaid, to Tiller and Sutherland, trustee.

The defendants filed their several answers to the bill denying the charges of fraud, Smith answering each allegation of the bill and the other defendants answering such parts as affected them severally.

The case was heard in the Circuit Court of Dickenson county upon the pleadings, exhibits filed and the depositions of more than sixty-five witnesses, and a decree was entered dismissing the bill at the costs of the complainant.  The case is before us on an appeal from that decree.

[1, 2] W. H. Smith conveyed to the school board the two acre lot in consideration of the conveyance to him

of the half acre lot. There is no ground on which he can ask for a cancellation of his deed to the board and he is satisfied with its deed to him, but the board asks for the cancellation of its deed to him on the ground that he failed to comply with some of the provisions and requirements of the statute in obtaining it. It will be observed that the statutes contain no provision imposing any duty on one who secures title to real estate from a school board, but prescribe what steps shall be taken by the board in order to acquire or pass title to real estate.

It was clearly the duty of the board to see to it that all the provisions of the statute, necessary to make its deed valid, were complied with, and upon its obligation to do this Smith deeded his two acres of land to the board.

It is settled law that a party, who assumes to convey an estate by deed, is estopped, as against the grantee, to assert anything in derogation of the deed. He will not be heard, for the purpose of defeating the title of his grantee, to say that at the time of the conveyance no title passed by the deed, nor can he deny to the deed its full operation and effect as a conveyance. 20 C. J. p. 1067 and cases cited.

The statute law relating to titles to school property is contained in sections 824, 1466-a and 1488 of Pollard's Code.

The sections aforesaid, so far as material to the consideration of this case, on February 14, 1917, read as follows:

Section 824. "Title to real estate for public uses to be approved by attorney at law; appeal.—Whenever it shall be necessary for any county, district school trustees, or other public officers of the county, having authority for the purpose, to purchase real estate, or

acquire title thereto for public uses, the contract therefor shall be in writing, and the title thereto shall be examined and approved in writing by a competent and discreet attorney at law, who. shall be designated by the judge of the circuit court for the circuit wherein the real estate is located, and such approval shall be recorded along with the deed, or other papers, by which the title is conveyed.   No such contract shall be valid unless and until the title to such real estate be thus approved; and if the attorney who has been designated by the court refuses to approve the same, the disapproval shall be in writing and filed with the clerk of the county.   The supervisors of the county, or any five citizens thereof, may, by motion, appeal of right from the decision of the attorney to the circuit court of the county, or to the judge thereof in vacation, submitting with said motion their petition, accompanied with the evidences of title.   Ten days' notice of such motion shall be given to the said attorney, and from the decision of the said court, or the judge thereof in vacation, upon said motion, an appeal of right may be taken by the petitioners to the Supreme Court of Appeals."

Section 1466-a.    Authorizing school boards to sell or exchange public school property.   "Any county, district or city school board may file its petition in the circuit court of its city or county or the corporation or the hustings court of its city, or before the judge thereof in vacation, asking leave to sell or exchange any public school property which in its judgment it is desirable to sell or exchange, and upon evidence being produced before the court, or judge thereof in vacation, that such sale or exchange is proper to be made, the said court, or judge thereof in vacation, shall make such order as may be proper providing for the sale of said property, or that the same may be exchanged    *    *    *    *    *."

Section 1488. Condemnation and purchase of land for schoolhouses. "* * * * * whenever it shall be necessary for any county or district school board, or other public officers of the county having authority for the purpose, to purchase real estate or acquire title thereto for public uses, the contract therefor shall be in writing, and the evidence of title be submitted to the circuit court, or to the judge thereof in vacation, for approval, which approval shall be entered of record by the clerk of the court. No such contract shall be valid unless and until the title to such real estate be thus approved; and if the court or judge refuse to approve the same, the disapproval shall be recorded in like manner."

[3] It is apparent that section 1466-a is the only section that applies to the sale or exchange of school property—the passing of title to property owned by a school board—and it is submitted that the provisions of this statute as well as section 1488 were fully complied with. But it is contended that it was necessary also to comply with the provisions of section 824. In this contention we cannot concur. Section 1466-a provides that "upon evidence being produced before the court, or judge thereof in vacation, that such sale or exchange is proper to be made, the said court, or the judge thereof in vacation, sha' make such *order as may be proper* providing for the sale of said property, or that the same may be exchanged." This is an *ex parte* proceeding before the court or judge thereof. The language quoted vests the court with plenary powers and it is not to be presumed that the judge will deem any order authorizing the exchange of the property *"proper"* until he has become satisfied that the title to the property which the school board will get in exchange is clear. This statute leaves the entire matter to the judge and

in cases of an exchange of property no separate proceeding under section 824 or section 1488 is necessary, in order to give validity to the deeds which are executed to consummate the exchange.

[4] Besides, sections 824 and 1488 have no reference to property which the board is endeavoring to *pass the title to,* but simply to property the title to which it desires to secure. And in the latter case, while they have the same object to accomplish, they prescribe two inconsistent methods of attaining it.

Under section 824 the title to the real estate to be purchased or acquired shall be *examined and approved in writing by an attorney at law,* designated by the judge of the circuit court, and such *approval* shall be *recorded along with the deed* for the property. While section 1488 requires that the *evidence of title* be submitted to the *judge of the circuit court* for approval, which approval shall be entered of record by the clerk of the court.

[5] There is no provision in either statute requiring the title to be passed upon by both the court and an attorney. The decision of either is final, if no appeal be taken. If the attorney refuses to approve the title, the deed would be void under section 824, even though the court approved it under 1488. If the attorney approved it and the court disapproved it, under the language of the statutes, we cannot say which one should prevail. In such an event the two statutes are irreconcilably in conflict.

[6] By the act approved December 10, 1903 (Laws 1903, c. 418), section 824 was so amended as to require the *evidence of title* to be *submitted* to the *circuit court or judge thereof for approval.* And by the act approved December 28, 1903 (Laws 1903, c. 509), section 1488 was also amended so as to include exactly the same provision. In Pollard's Code 1904, vol. 1, both stat-

utes contain these same provisions, which remained in force until section 824 was so amended by the act approved February 20, 1912 (Laws 1912, c. 46), as to require the title to be *examined and approved in writing by a competent and discreet attorney at law*, and *such approval to be recorded along with the deed.* By the act approved March 21, 1914 (Laws 1914, c. 166), section 1488 was amended and re-enacted with the same clause, contained in the act of December 28, 1903, requiring the title to be *approved by the circuit court or the judge thereof.* This being the latest enactment it repeals by necessary implication so much of section 824 as required the title to be examined by an attorney.

In the absence of fraud, it follows we cannot set aside the deed from the school board conveying to Smith the half acre lot.

[7] Was W. H. Smith guilty of such fraud and improper influence in obtaining this exchange deed as to warrant the court in granting the relief prayed for in the bill?

This suit was instituted two years after the exchange of the lots was accomplished, and not until two trustees who were in favor of this proceeding had been appointed to succeed T. K. Colley and A. J. Viers.

The bill contains numerous allegations of fraud and improper conduct on the part of W. H. Smith and his friends, and the testimony is voluminous and conflicting, and much of it immaterial. We shall not attempt to discuss every question raised in the record, but only such as may appear necessary in order to properly dispose of the allegations of fraud.

It is alleged in the bill that the judge of the circuit court was imposed upon by the fraudulent acts and representations of appellees, Smith and Colley, trustee, and induced to enter the order approving the ex-

change of the one-half acre lot, which he would not have done had he known the facts. Yet, after argument and a full consideration of all the facts shown in evidence, the distinguished judge of the circuit court decided he had not been imposed upon, that no fraud had been proven, and dismissed the bill.

The board alleges in its petition that there are twenty issues raised in the case. These we will now consider:

First Issue: "As to the plans of the Clinchfield Coal Corporation, for the development at Moss at the time Smith left the employment of the company, January 31, 1913, and what of these plans were known to him."

[8, 9] It is extremely doubtful that Smith, while in the employ of the Clinchfield Coal Corporation, secured any secret information as to the plans of the corporation to locate a mining town at Moss, which was built four years after he left the company. If he did, he occupied no confidential relation with the school board and was under no obligations to disclose to it information which he had obtained from any source.

"Silence on the part of the purchaser or failure to disclose knowledge on his part of the peculiar value of the property sold would not be sufficient to set aside a sale fairly made without misrepresentations or fraud." *Merchants' Bank* v. *Campbell*, 75 Va. 460.

If it is true, as contended by the appellant, that at the time of the exchange the development at Moss was so apparent that every one knew or ought to have known it, then Smith's secret information, if he possessed any, was of no value to him and could not have prejudiced the school board.

Second Issue: "As to what had been done and was being done at Moss at the time the defendant Smith obtained his deed for the schoolhouse lot, in the way of installing the plant of the Clinchfield Coal Corporation."

The evidence on this question is very conflicting. But it plainly appears that some camps and temporary buildings were in process of construction and that the engineers were making surveys. Some of the witnesses testified that work of this kind had been going on in Dickenson, at different places, for many years and that it did not always mean what it seemed to indicate. It appears from a statement filed in evidence by the auditor of the Clinchfield Coal Corporation that the company's pay roll for January, 1917, at Moss was $172.75, and for February, 1917, $180.41, which shows beyond doubt that the company was doing very little work at that point in February, 1917.

Third Issue: "As to whether or not S. J. Colley, Jr., and Eivens Tiller were interested with Smith in acquiring the schoolhouse lot."

The charge is that T. K. Colley, one of the trustees, colluded with these three defendants in procuring this lot and that S. J. Colley, Jr., his son, and Tiller were interested with Smith in acquiring it. This charge is not sustained by the proof. Smith denies that young Colley was in any way interested in the purchase of the property and S. J. Colley, Jr., who is a man of good reputation and cashier of a bank, testified that he had no knowledge of the negotiations for the purchase of the lot until after the deeds were executed; that he did, sometime thereafter, discuss with Smith the question of purchasing a one-sixth interest in the lot, but, on account of his lack of money, the proposition was never consummated. T. K. Colley, trustee, father of S. J. Colley, Jr. denied the charge of collusion and testified that he never heard of his son being connected in any way with the transaction. This testimony is not successfully contradicted.

On the day before the exchange was made, Smith bor-

rowed a thousand dollars of Tiller to make a payment on the Viers land and told him of the proposed exchange and stated to Tiller that if the deal was consummated he would sell Tiller a one-sixth interest in the school lot and credit it on another note Smith owed him.    Tiller refused to accept the proposition, claiming the price asked by Smith, $150, was too high.    The matter was dropped, but about a year later Tiller did purchase a one-sixth interest in the lot, at $150, and credited the amount on a note for $250, which Smith owed him. This fact is entirely immaterial, however, to the issue involved here as Tiller never mentioned the exchange of these lots to either of the trustees, or in any way attempted to influence them in the matter.

Fourth Issue: "As to why Smith and his associates attempted to exchange another lot for the schoolhouse lot instead of purchasing the lot at a sale," and,

Fifth Issue: "As to Smith and his associates purchasing the Viers farm at an exorbitant price so as to have a lot to exchange for this school lot."

[10] Knowing the school board was considering the advisability of securing a new location further up Mill creek and being the owner of the Viers tract only a mile and a half away, it was but natural that Smith should offer to *exchange* a larger lot for the schoolhouse lot, rather than buy it, and to do so was not a badge of fraud.    It is to be presumed that the board would not have *sold* the lot without knowing where a larger one could be secured.

Upon the conflicting evidence as to the value of the Viers farm, we cannot say it was not worth the price paid for it.    There is no proof that A. J. Viers, trustee, was in any way influenced by the fact that his brother was selling the land to Smith.

Sixth Issue: "As to the defendant, Smith, knowing

that the schoolhouse lot at Moss was in a bad location for a school, and the present building being totally inadequate, and as to no improper influences being brought to bear on T. K. Colley and A. J. Viers, two of the trustees, to cause them to make this exchange, and that their actions were for the public good."

[11, 12] There is no evidence in the record which will satisfy an impartial mind that T. K. Colley and A. J. Viers were actuated by any improper motive in exchanging the old school lot for the two-acre lot. The old lot was admitted to be too small and the building inadequate. The patrons of the school, led by N. C. Deel, one of the present trustees, had, prior to that time, urged a change of location to a point further up Mill creek, and there is nothing in the evidence to prove that these trustees did not do what they believed at the time to be for the best interest of the people of the district.

Seventh Issue: "As to Smith going to Big Stone Gap to secure the services of lawyers to prepare the petition for this exchange, and as to his having A. A. Skeen make the abstract of title to the lot which he was letting the school board have."

Smith had agreed with the school board to have the petition and deeds prepared and titles examined at his own expense. The employment by him of such distinguished members of the bar as A. A. Skeen and R. T. Irvine, of Big Stone Gap, was certainly not even a badge of fraud.

Thirteenth Issue: "As to the value of the school lot."

At the time of the exchange Eivens Tiller, a prominent and successful business man, who had served two terms as treasurer of Dickenson county, and was doubtless well informed as to property values in the county, refused to purchase a one-sixth interest in this lot for $150. One year later he bought the same interest for

that amount.    Since the town of Moss has been built up around this lot it has doubtless greatly enhanced in value and, it may be, would now sell for several thousand dollars, in view of the fact that it is the only lot at Moss not controlled by the Clinchfield Coal Corporation and has upon it a store operated by W. H. Smith in competition with the corporation's own mercantile business.    We are satisfied, however, that the valuations placed upon it by many of the complainant's witnesses are greatly inflated.    The mere fact that the lot has greatly enhanced in value since Smith acquired the title to it is no reason for stamping the transaction as fraudulent.

Sixteenth Issue: "As to the activity of T. K. Colley in getting the exchange closed up."

Appellant claims that the record shows that T. K. Colley acted dishonestly as an official.    In this contention we cannot concur.    There is no suggestion that he derived any personal gain out of the exchange of the lots, but, it is contended that he was too active "in getting the exchange closed up."    The record shows that he had reason to believe many of the people of the district desired the location of the schoolhouse changed to a point further up Mill creek, and that he was convinced it would redound to the interest of the public to make the change.    Being so convinced it was his duty to call a meeting of the school board to consider the proposition offered by W. H. Smith and when the proposition was approved by the board it was his duty, or the duty of some member of the board, to present the proper petition to the judge of the circuit court, supported by the necessary proof, and secure an order authorizing the trustees to execute the exchange deed.    Notwithstanding the efforts of the appellant to besmirch his character and reputation, many leading citizens of his county tes-

8

tified that T. K. Colley's reputation for honesty and freedom from corrupting influences is still good.

[13] When asked, "Why were you so keen to make the exchange," T. K. Colley answered: "for the benefit of the district."

The suggestion that it was legally necessary to consult the division superintendent of schools before making the exchange of the school lot is without merit. The legislature has prescribed the necessary procedure to exchange school property and there is no provision requiring that the exchange shall be approved by the division superintendent.

[14] Seventeenth Issue: "As to the carelessness of the trustees in not making an investigation as to the value of the old schoolhouse lot at Moss."

While it may have been negligence on the part of the trustees not to make some investigation of the value of the school lot, they were doubtless fairly well informed on the subject, and their failure so to do did not constitute a badge of fraud.

The remainder of the "twenty issues" involve matters which, in our view of the case, have little bearing on the question of fraud, or matters considered elsewhere in this opinion, and a further discussion of them *seriatim* would prove unprofitable.

It is true that Fletcher Powers, the only one of the old trustees now on the board, testified that he thought the exchange transaction was a fraud; but, on February 28, 1918, more than a year after the exchange was made, he wrote W. H. Smith a letter containing the following language:

"Yes, I believe you acted in good faith in that schoolhouse lot transaction    *    *    *    .

"The Mill creek schoolhouse lot is your property, and, so far as I am concerned, you may take possession

of it just any time you see fit.   The school taught there this year was not a success, so I am informed, and then said schoolhouse is not large enough to accommodate the children who might wish to attend the school there.''

Evidently this letter was written before the question of instituting this suit had been agitated among the people of his district, and while he entertained the same views he entertained the day he voted for the exchange.

The charge that W. H. Smith conducted his negotiations for the exchange with great secrecy is not borne out by the testimony.   He first discussed the matter with T. K. Colley, trustee, on the street in the town of Clintwood, and next appeared before the school board at a meeting called for the purpose and presented his proposition for their consideration; and later he appeared before the judge of the circuit court who had to grant the authority for the exchange to be made.   It can hardly be said that a business transaction thus handled was handled with great secrecy.

Upon a careful consideration of the whole record we have reached the following conclusions:

(1) If developments of the Clinchfield Coal Corporation at Moss had been permanently suspended on February 14, 1917, this suit would never have been instituted.

(2) The school board of Sand Lick district made the exchange of the Mill creek school lot in good faith, believing they were doing what was for the best interest of the people of Sand Lick district.

(3) The record fails to show that W. H. Smith perpetrated a fraud, or used any improper influence, in obtaining the exchange, for which his deed should be set aside.

[15] (4) If Smith got the better bargain in the trade, it was his good fortune, and the school board is in the

position of many good business men who have made bad bargains.    It is not the duty of a court of equity to relieve from hard bargains simply because they are such.

For the foregoing reasons, the decree under review will be affirmed.

*Affirmed.*